UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| GABRIELLE RUSSANO | * | CIVIL ACTION NO. 23-1353 |
| | * | |
| VERSUS | * | SECTION: "H"(1) |
| | * | |
| MARTIN O'MALLEY, | * | JUDGE JANE TRICHE MILAZZO |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Gabrielle Russano, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381. The matter has been presented for decision by the parties' briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 11, 12). For the following reasons, IT IS RECOMMENDED that the decision of the Commissioner be reversed and this matter be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**Procedural Background**

Ms. Russano[1] applied for SSI on May 17, 2021, originally asserting a disability onset date of June 3, 2020.[2] R. at 95. She alleged the following illnesses, injuries, or conditions: schizophrenia and anxiety. Id. On September 16, 2021, her claim was denied by the state agency. R. at 92. She requested reconsideration, which was denied on March 16, 2022. R. at 111.

---

[1] Ms. Russano was 25 at the time of application.
[2] Previously, in April 2019, Ms. Russano filed an application for benefits that was denied by the state agency, on reconsideration, and on appeal to the Administrative Law Judge. The Appeals Council denied review on February 1, 2021. It appears she did not appeal this decision to the federal courts.

Ms. Russano obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"). The initial hearing was set before the same ALJ that had denied her earlier application. R. at 62-67. That ALJ offered Ms. Russano the opportunity to be allocated to a different ALJ, which Ms. Russano accepted. Id. A hearing was held before the newly assigned ALJ on December 15, 2022. R. at 43-59. At that time, Ms. Russano amended her alleged disability onset date to May 17, 2021. R. at 47. On December 28, 2022, the ALJ issued an adverse decision. R. at 20-35.  Ms. Russano timely appealed to the Appeals Council, which denied review on March 7, 2023. R. at 1.

On April 23, 2023, Ms. Russano filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 9, 10). The parties filed briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 11, 12). Ms. Russano is represented by counsel.

## Evidence in the Record

*Hearing Testimony*

At the hearing before the ALJ, Ms. Russano testified that she hears voices daily in bursts a few times a day and then pretty consistently at night. R. at 49. Stress makes them worse. Id.  The voices talk about sexual topics and say things like "I feel bad for you." R. at 50. They call Ms. Russano a pedophile and say things like "there's a demon in [her] psyche." Id.  She testified that the voices make it difficult for her to concentrate. Id.  For example, while working on homework for online school she could hear a voice in a judgmental tone that gave her persecutory feelings and caused her to feel paranoid. Id.  She felt overwhelmed and wanted to close her eyes and lay in bed and stop doing everything. R. at 50-51.

Ms. Russano takes medication by injection for the voices. R. at 50. She also goes to counseling every two to three weeks. R. at 54. She takes anxiety medication and blood pressure

medication as well. Id.  She testified that her medication does help and that she does not miss doses. Id.  She testified that at times, things have improved and she has heard the voices less. Id. For example, at the beginning of the spring semester in 2021, she was not hearing the voices too much. Id. But then her delusions and feelings of dread came back. Id.

Ms. Russano tried working at the drive-thru at Jimmy John's and as a stocker at Winn-Dixie in 2019. R. at 48, 51. But she heard voices, got panic attacks, and had anxiety. R. at 51. Her co-workers commented on her flat affect and said she needed to be more lively, but she did not feel that inside of her and it made her feel really bad. Id.  She had a lack of motivation and low energy and felt she wanted to run out of the jobs every day she worked Id.  She ended up quitting both jobs—she only worked at each for about two weeks. R. at 48, 51.

Ms. Russano testified that her anxiety and the voices were about the same severity at the time of the hearing as they had been when she tried working in 2019. R. at 51. She noted that they had come back recently, although usually her grandmother's home is a low-stress environment. Id.  She added that she was not having panic attacks at her grandmother's home because she is not in social situations. Id.  In contrast, she has had panic attacks at school and at work. R. at 52. It started in fourth grade—as a result she was allowed to visit the vice principal when they occurred. Id. And she withdrew from college because of the panic attacks. Id.  But she does not have panic attacks every time she leaves home. Id.  She noted that she does not really go places anymore though. Id.  She gets persecutory feelings and thoughts when she overhears other peoples' conversations, so she has stopped going to the grocery store with her grandmother. Id.  When she is home alone, she gets paranoid and has to put on her headphones. Id.  She does not want to hear anyone knock on the door. R. at 53. And she becomes paranoid that she will hallucinate by herself. Id.

3

At the time of the hearing, Ms. Russano was taking online courses at Fort Hays State University. R. at 53. She had been on vacation to Panama City, Florida and to Disney World. R. at 55. She reported that being around people at the pool stressed her out and that she was very scared to get on the plane. Id.  She did not hear voices much but struggled with anxiety. Id.

*Testimony of Vocational Expert*

Vocational expert Evelyn Hartman testified at the hearing. R. at 56. In response to Ms. Russano's questioning, Ms. Hartman testified that there would not be work available for an individual that would be off task more than 15 % of the day. R. at 57. If an individual would need a job coach to keep them on task, there also would not be any jobs available. R. at 57-58.

The ALJ then asked Ms. Hartman to consider a hypothetical individual with similar education and lack of work experience as Ms. Russano who could do medium level work, one to two-step tasks, preferably not dealing with the general public, incidental dealing with co-workers, and not working on an assembly line or timed type of project. R. at 58. Ms. Hartman testified that such an individual could perform the jobs of kitchen helper, Dictionary of Occupational Titles Code 318.687-010, unskilled with an SVP of 2 and medium exertion level, with approximately 280,200 jobs available nationally; cook helper, DOT Code 317.687-010, with SVP of 2 and medium exertion level, with approximately 79,350 jobs available in the national economy; and industrial cleaner, DOT code 381.687-018, with SVP of 2 and medium exertion level, with approximately 11,830, jobs available nationally. R. at 58.

Ms. Hartman then confirmed that jobs would not be available for such an individual if she was off task more than 15% of the day or needed a job coach to keep her on task. R. at 58.

*Medical Evidence of Record*

Ms. Russano was committed for mental health treatment in October 2018 with an admitting diagnosis of psychosis. R. at 438-458. After about 10 days of inpatient treatment, she was discharged with a prescription for Risperidone. R. at 446. At that time, she began treating at the Mandeville Behavioral Health Clinic with Advanced Practice Registered Nurse Cathy Davis. R. at 467. At her initial evaluation in November 2019, Ms. Russano reported symptoms of anxiety, depression, and auditory hallucinations of mumbled voices that she could not understand. Id. Ms. Russano continued to treat with Nurse Davis monthly throughout 2019. R. at 475-500; 530-42.

Ms. Russano began treating with social worker Randy Parent in February 2020. R. at 547. She continued treating approximately every month with both Parent and Davis throughout 2020 and into 2021.[3]

Ms. Russano followed up with Nurse Davis on March 1, 2021, reporting that things were good. R. at 655. She continued to have symptoms of anxiety, reporting improvement as symptoms had lessened in frequency or intensity. Id. She was only taking Klonopin at night. Id. She reported anxiety symptoms once daily. Id. She did not describe depressive symptoms or symptoms of manic process. Id. She described auditory hallucinations, but that they had lessened. Id.

Upon examination, she appeared friendly, calm, attentive, and relaxed. Id. Her speech was normal and her language skills intact. Id. Her mood was normal with no signs of depression or mood elevation. Id. Her affect was appropriate, full range and congruent with mood. Id. There were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Id. Her associations were intact, her insight into problems was normal, and her judgment was intact. Id. There were no signs of anxiety or hyperactive or attentional difficulties.

---

[3] The Court does not address these earlier records in detail because they are before the alleged onset date of May 17, 2021.

Id. She was continued on Abilify, Klonopin, Rimeron, and Risperdal and her Lexapro was increased. R. at 658.

She met with social worker Parent on March 31, 2021. R. at 685. She reported hearing voices and seeing shadows. Id. Her mood was anxious and her thought processes were positive for hallucinations and delusions. Id. Her insight and judgment were fair. Id.

Ms. Russano returned to see Nurse Davis on April 23, 2021. R. at 622. She reported she was "ok." Id. She had gone out to three places over the weekend, and it was very noisy. Id. Her anxiety increased and she had to take a Klonopin. Id. She reported that her anxiety symptoms continued unchanged, with anxiety occurring multiple times per day. Id. She also reported that her depressive symptoms continue to occur episodically. Id. She reported that she was at the end of the semester and grades were "working well." Id. It was noted that she is often suspicious of other people's motives and that she thought a friend wanted to kill her and that others were watching her. Id. Findings upon examination were normal, just as at her March 2021 visit. R. at 622-23. Abilify was discontinued. R. at 626. She was continued on Lexapro, Klonopin for breakthrough anxiety, Risperdal if she continued to have voices, and Remeron. R. at 626-27. She was restarted on Invega Sustenna. R. at 626.

Ms. Russano met Mr. Parent on May 27, 2021. R. at 686. She was more worried about Covid. Id. She reported an increase in nightmares and visual hallucinations at night. Id. Her mood was anxious, and her thought process was positive for hallucinations and delusions. Id. Her insight and judgment were fair. Id.

Ms. Russano followed up with Nurse Davis on June 18, 2021. R. at 628. She reported having some crying issues and that she tried to quit but it caused increased sadness. Id. She reported feelings of anxiety and apprehension, with anxiety symptoms occurring often during the

day. Id.  She described auditory hallucinations, noting that she hears voices but some days are better than others. Id.  On examination, she was sad looking, attentive, communicative, and relaxed. Id.  She had normal speech. Id. She exhibited mild symptoms of depression. Id. Her affect was appropriate. Id. There were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic processes. Id.  She was fully oriented. Id. Her insight and judgment were fair. Id. There were no signs of anxiety. Id.  There were no signs of hyperactive or attentional difficulties. Id. She was continued on Invega Sustenna, Klonopin, and Risperdal. R. at 631. She was prescribed Trintellix for anxiety and Zofran for nausea. Id.

Ms. Russano presented to social worker Parent on July 15, 2021. R. at 687. She reported feeling better lately and that she realized we would eventually get through the pandemic. Id.  She reported sleeping better and that she had even visited friends over the weekend. Id.  Her mood was euthymic Id.  Her thought processes were negative for hallucinations and delusions. Id.

On July 16, 2021, she followed up with Nurse Davis. R. at 633. She reported doing fine but that she did hear more voices while on vacation. Id. She reported that her auditory hallucinations had lessened. Id.  She continued to report anxiety symptoms, noting that some days it's good and some days she needs a Klonopin. Id. On examination, Ms. Russano was friendly, calm, attentive, communicative, and relaxed. Id. Her speech was normal. Id. Her mood was normal with no signs of depression or mood elevation. Id. Her affect was appropriate. Id.  There were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Id.  There were no signs of anxiety or hyperactive behaviors. R. at 634. She was continued on Invega Sustenna for psychosis, Trintellix for depression, and Klonopin for severe anxiety. R. at 636.

Ms. Russano returned to see Nurse Davis on August 13, 2021. R. at 671. She reported the voices were 98-99% gone. Id.  She denied any depression with Trintellix. Id.  She continued to report some paranoid feelings and thinking that people are talking about her. Id.  Findings on examinations were normal, as they had been in July. Id. She was continued on Invega Sustenna, Trintellix, and Klonopin. R. at 673-74.

Ms. Russano participated in a telehealth session via Zoom video with licensed clinical social worker Julie Schlumbrecht on September 28, 2021. R. at 877. Ms. Russano reported hearing voices sometimes. Id. She had not heard any that day, but they usually start in the evening. R. at 878.  She reported doing well with daily living skills and school, and she reported her sleep and exercise were good. R. at 877. She reported seeing her therapist via telehealth. Id.  She reported that she did not like driving and that the last time she did, she hit the garbage can and when she left the gas station she forgot to put on her seat belt. R. at 878. She reported taking Klonopin 1mg, but that she had only taken .5 mg that day because she wanted to see if she could wean off. Id.  She reported that her anxiety is not controlled. Id. Schlumbrecht noted that Ms. Russano's behavior had been stable and uneventful and that medication compliance was good. Id. On examination, Ms. Russano had no apparent serious mental status abnormalities. R. at 879. She did not exhibit depression or mood elevation; her speech was normal and her language skills intact. Id. Her thinking was "basically logical" and her thought content was appropriate. Id.  There were no apparent signs of anxiety. Id.  Schlumbrecht concluded that Ms. Russano continued to need outpatient treatment because she continued to exhibit symptoms of an emotional disorder that interfered with her day-to-day functioning. Id.

Ms. Russano returned to social worker Parent on September 6, 2021. R. at 688. She reported she had been enjoying school but she needed to discipline herself more when it comes to

studying. Id.  She reported sleeping better and that she was not having any night-time hallucinations. Id.  Her mood was euthymic and her thought processes were negative for hallucinations and delusions. Id.

She followed up with Mr. Parent a month later on October 6, 2021. R. at 689. She reported that she was becoming overwhelmed with school and had been unable to sleep at night, which increased the voices and paranoia. Id.  Her mood was sullen. Id.  Her thought processes were negative for hallucinations but positive for paranoid delusions. Id.

Ms. Russano returned to Metropolitan Behavioral Health Clinic to see Nurse Davis on October 22, 2021. R. at 884. She reported "doing better." Id.  She had continued symptoms of anxiety, but her symptoms were less frequent or intense. Id.  She reported that taking Klonopin in the morning has helped the entire day. Id. Symptoms of depression were continuing. Id.  She was unsure that the Trintellix was working. Id.  Ms. Russano continued to describe auditory hallucinations, although she reported that they had lessened. Id.  Findings on examination were normal, as they had been on the previous two visits. Id. Trintellix was discontinued and Viibryd was prescribed. R. at 887. She was continued on Invega Sustenna and Klonopin. Id.

Ms. Russano returned to see Nurse Davis on November 19, 2021. R. at 889. She reported she was fine and had not noticed any big change. Id. She reported some symptoms of anxiety and more social anxiety. Id.  She reported anxiety symptoms multiple times during the day. Id. Symptoms of depression were continuing. Id. She described auditory hallucinations. Id. She reported hearing voices several days a week talking about her teachers and school. Id.  She described them as "just annoying." Id.  She denied voices at night. Id.  She went to Disney for a week and did not hear any voices. Id.  She had some anxiety in the parks but mostly when she was alone in the hotel room she would get scared. Id.  Findings upon examination were normal as they

9

had been on the preceding three visits. Id. She was continued on Klonopin, Invega Sustenna, and Viibryd. R. at 893.

Ms. Russano followed up with Mr. Parent on December 22, 2021. R. at 690. She reported she was excited about Christmas and seeing her brother. Id.  But she was very paranoid about Covid and was starting to hearing voices, primarily at night. Id.

Ms. Russano followed up with Nurse Davis on January 10, 2022. R. at 894. She reported doing good. Id.  The voices were better—she had not heard them the entire weekend. Id.  She had continuing symptoms of anxiety. Id.  She reported getting anxious about different events but that she did well during the Christmas Eve party at home. Id.  She also reported continuing symptoms of depression. Id.  She reported her symptoms had improved as they had become less frequent or less intense. Id.  She continued to describe auditory hallucinations, although they had lessened. Id. She also reported a poor sleep pattern of getting up for a couple of hours and then taking a nap during the day. Id.  Upon examination, she presented as she had on the previous four visits, with normal mood, appropriate affect, and no signs of depression, mood elevation, psychotic process, anxiety, or attentional difficulties. R. at 894-95. She was continued on Viibryd, Klonopin, and Invega Sustenna. R. at 399.

Ms. Russano returned to see Mr. Parent on January 20, 2022. R. at 691. She reported she had been able to attend a few parties, but became overwhelmed a few times and needed to seclude herself. Id.  She reported having occasional auditory hallucinations. Id.  She also reported erratic sleep but that she was trying to stay away from sleep aids. Id. She was enjoying school but she was concerned that the symptoms of her schizophrenia would interfere with her ability to go very far in any profession she wants to pursue. Id.  Her mood was anxious. Id.  Her thought process was positive for hallucinations. Id.

Ms. Russano returned to see Nurse Davis on January 31, 2022, reporting that she believed Viibryd was increasing the voices. R. at 901. She described auditory hallucinations including tones, music, and voices. Id.  She could not really understand what the voices were saying. Id. Depressive symptoms continued but she reported symptoms had improved. Id.  She reported that since school started again she had things to do. Id.  She reported her paranoia was better and she was not as worried about something happening to her in the house alone. Id.

Upon examination, Ms. Russano was friendly, calm, attentive, communicative, and relaxed. Id. Her mood was normal and her affect was appropriate. Id. She showed no signs of depression, mood elevation, psychotic process, or anxiety. Id.  Viibryd was discontinued. R. at 905. She was continued on Klonopin and Invega Sustenna. Id.  She was started on Hydroxyzine for anxiety. Id.

She returned to see Nurse Davis about a week later on February 7, 2022, reporting that she was having a hard time getting motivated to do her schoolwork. R. at 907. She reported continued anxiety symptoms. Id.  She also described symptoms of ADHD:  she gets distracted easily, is fidgety, and has trouble staying focused to complete work on time. Id. She reported that the Vistaril (hydroxyzine) caused her to be a zombie and she could not get up and work. Id.  She did not describe any depressive symptoms but described manic process. Id.  She described auditory hallucinations that had remained the same. R. at 908.

Upon examination, Ms. Russano appeared flat, distracted, minimally communicative, and tense. Id. Her speech and mood were normal. Id.  There were no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Id.  Her associations were intact and her thinking was logical. Id.  She was fully oriented. Id. There were no signs of anxiety, depression,

11

depression, mood elevation, or hyperactive or attentional difficulties. Id.  Hydroxyzine was discontinued. Id. Klonpin and Invega Sustenna were continued. Id.

Ms. Russano saw Mr. Parent on February 17, 2022. R. at 972. She reported feeling depressed and unmotivated to do much. Id.  she reported hearing voices and having intrusive thoughts. Id.  Her mood was depressed and her thought processes were positive for hallucinations. Id.

She followed up with Davis the following week on February 21, 2022. R. at 913. She reported doing good. Id.  Her ADHD symptoms were continuing with symptoms daily. Id. The Adderall was helping with her starting school and keeping up with classwork. Id. She reported an improved attention span and ability not to become easily distracted. Id. She reported continued symptoms of anxiety, though they had lessened in frequency or intensity. Id.  She reported symptoms of panic disorder, with panic attacks and a persistent concern about having additional panic attacks. Id.  She reported using coping skills like using headphones, which helps minimally. Id.  She reported having some paranoia when she stopped Klonpin. Id.  But she had been taking Klonpin at bedtime, which was helping with the voices. Id.  She described auditory hallucinations that had restarted talking about different things. Id.

Upon examination she presented as friendly, calm, attentive, communicative, and relaxed. Id.  Her mood was normal with no signs of depression or mood elevation. Id. Her affect was appropriate, full range and congruent with mood. Id. There were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Id.  She was fully oriented and her associations were intact. Id.  Her judgment and insight were fair. Id. There were no signs of anxiety or hyperactive or attentional difficulties. R. at 913-14. She was continued

on Invega Sustenna and Adderall. R. at 917. Her Klonopin prescription was reduce from 1 tablet twice daily as needed to 1 tablet at bedtime and up to twice daily as needed. Id.

Ms. Russano returned to see Nurse Davis on March 7, 2022, reporting that she thought the new medications were working better. R. at 919. She described ADHD symptoms with short attention span but improved ability to finish a task and improved organizational skills. Id. She reported daily symptoms. Id. She also reported continued anxiety symptoms, but they had improved. Id. She described manic process, but her symptoms had lessened. Id. She was still experiencing paranoia when home alone, but she had answered the door that week when no one else was there. Id. She reported that her auditory hallucinations remained the same. Id. Ms. Russano presented as friendly, calm, attentive, communicative, and relaxed. Id. Findings upon examination were normal, as they had been on the previous visit. Id. She was continued on Aderall, Klonopin, and Invega Sustenna. R. at 923.

Ms. Russano presented to Mr. Parent on March 16, 2022. R. at 973. She was feeling better and trying to do more with her family and friends. Id. She had not been studying much and was afraid she would fail her classes. Id. She had not been hearing voices as much, but she was afraid they would come back soon. Id. She denied being as depressed and focused more on her anxiety and worry. Id. Her mood was anxious. Id. Her thought processes were positive for auditory hallucinations. Id

Ms. Russano followed up with Social Worker Schlumbrecht on April 6, 2022. R. at 925. She reported negative symptoms of schizophrenia. Id. She reported her daily living skills were good and sleep were good, but her grades had dropped and she was doing little exercise. Id. She reported that her mood had been content overall, that she had not heard any voices in the preceding three days, and that she did not think she had delusions anymore. R. at 926. She was failing 2

classes, but last semester she had gotten 2 As and a B. Id. Schlumbrecht noted that Ms. Russano's behavior had been stable and uneventful and that her medication compliance was good. Id.

Upon examination, her mood was euthymic with no signs of depression or manic process. Id. She denied hallucinations and delusions. Id. Her assertions were intact. R. at 927. There were no signs of anxiety or attentional or hyperactive difficulties. Id. Schlumbrecht concluded that Ms. Russano continued to need outpatient treatment. Id.

Ms. Russano returned to Mr. Parent on April 19, 2022. R. at 974. She was having a bad week because of the voices and bad intrusive thoughts. Id. She felt everyone was talking about her and laughing at her. Id. Her mood was anxious. Id. Her thought processes were positive for auditory hallucinations. Id.

Ms. Russano followed up with Nurse Davis on May 5, 2022. R. at 930. She reported that she still had some issues with focus at school. Id. She described continued symptoms of anxiety with subjective apprehension symptoms. Id. She reported that she did not do well recently when a lot of family came in and changed the routine at home. Id. She had to take Klonopin twice a day for the preceding two days. Id. She denied paranoia. Id. She described auditory hallucinations as a muffled voice a few times when her injection was due. Id. She continued to describe symptoms of ADHD:  short attention span, difficulty completing tasks, and problems with organization. Id. She had Bs in two of her classes, a D in one class, and an F in another class. Id.

Upon examination, she presented as friendly, attentive, and communicative, but tense. Id. She had normal speech. Id. Her mood was normal with no signs of depression or mood elevation. Her affect was appropriate and there were no signs of psychotic process. Id. Her insight and judgment were fair. R. at 931. There were no signs of anxiety or hyperactive or attentional

difficulties. Id.  Her prescription for Adderall was increased to 15mg and she was continued on Invega Sustenna. R. at 933-34.

Ms. Russano returned to see Nurse Davis on May 17, 2022, reporting lots of voices. R. at 935. She heard increased mumbling. Id. She reported continued anxiety symptoms and a subjective feeling of apprehension. Id.  She reported the increase in voices increased her anxiety. Id.  Upon examination, Ms. Russano appeared guarded and tense. Id.  Her speech was normal. Id.  Her mood was normal with no signs of depression or mood elevation. Id.  Her affect was appropriate. Id.  Psychotic or borderline psychotic symptoms appeared to be present and bizarre behavior was observed. Id. She was fully oriented and her insight and judgment were fair. R. at 935-36. There were no signs of anxiety or hyperactive or attentional difficulties. R. at 936. She was continued on D3, Klonopin, and Invega Sustenna. R. at 938. Adderall was discontinued. Id.  She was started on Caplyta. Id.

She followed up with Davis ten days later on May 27, 2022, and reported that she was still hearing voices and that her sleep was messed up. Id.  She continued to experience symptoms of anxiety. Id.  She reported increased anxiety due to the voices. Id. She did not describe depressive symptoms. Id.  She reported that her auditory hallucinations had worsened. Id.  Upon examination, Ms. Russano presented as happy, attentive, communicative, but anxious. R. at 940. Her speech, mood, and affect were normal. Id.  She had no apparent signs of psychotic process. Id.  She was fully oriented with no signs of anxiety or hyperactive or attentional difficulties. Id.  She was continued on Caplyta and Invega Sustenna. R. at 944.

Ms. Russano returned to social worker Parent on June 16, 2022. R. at 975. She said she was feeling better after some medication changes. Id.  She did not do well in school and that was

bothering her. Id.  She had been talking to her brother almost every day and that helped her a lot. Id.  Her mood was sullen. Id.  Her thought processes were positive for hallucinations. Id.

Ms. Russano followed up with Nurse Davis on June 24, 2022. R. at 946. Her grandmother attended with Ms. Russano's permission and stated that she had been wanting to eat dinner with them and had gone out shopping a few times. Id.  Ms. Russano reported some exhausted periods where she was not sleeping, but the voices were better with Perseris and Klonopin. Id.  She continued to have symptoms of anxiety, but they had improved with Klonopin. Id.  She reported experiencing anxiety multiple times a day. Id.  She also reported sleep disturbances caused by anxiety. Id.  She was not sleeping at night and napping several times a day. Id.  She also reported symptoms of ADHD:  poor attention span and often fidgety. Id.  She denied paranoia. Id. She stated that she is not worried when she is home alone since starting Perseris. Id.  She described auditory hallucinations that had remained the same, but not as loud. Id.

Upon examination, Ms. Russano appeared friendly, calm, happy, attentive, communicative, and relaxed. Id. She had normal speech, mood, and appropriate affect. Id.  There were no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process Id.  She was fully oriented. Id. There were no signs of anxiety or hyperactive or attentional difficulties. R. at 947. She was continued on Perseris, Klonopin, and vitamin D3. R. at 950-51.

On the same day, Nurse Davis filled out a Medical Source Statement form on June 24, 2022. R. at 728-31. She reported treating Ms. Russano since November 2018, that Ms. Russano is currently working the first episode of a psychosis program, and that she sees Ms. Russano on a regular basis. R. at 730-31. She opined that if employed, Ms. Russano would miss five or more days of work due to medical conditions and appointments. R. at 728. She opined that Ms. Russano

would be off task 10-25% of the day due to inability to pay attention. Id.  She estimated Ms. Russano would need to take 30-45 minutes of breaktime per workday. Id. In response to the question "Do you believe Gabrielle exaggerates symptoms related to her medical conditions, or is a malingerer?" She checked "no opinion" and for comments she checked "No" and wrote "malingerer." Id.  She opined that Ms. Russano frequently experiences sleep disturbance; social withdrawal or isolation; blunt, flat, or inappropriate affect; illogical thinking or loosening of associations; delusions or hallucinations; difficulty thinking or concentrating; persistent irrational fears; paranoia or inappropriate suspiciousness; and generalized persistent anxiety. R. at 730.  She opined that Ms. Russano's impairments would moderately limit her activities of daily living, her ability to report to work on time every day, her ability to work in coordination with others, her ability to follow basic instructions and stay on task, and her ability to complete tasks in a timely manner. Id. She opined that Ms. Russano was markedly limited in her ability to deal with normal work stress and her ability to maintain social functioning. Id.  She opined that Ms. Russano's conditions would prevent her from performing full-time, competitive, and ongoing work. Id.

Ms. Russano returned to see social worker Parent on July 12, 2022. R. at 976. She had been spending a lot of time with family and friends:  she would enjoy herself but then she would become paranoid if someone looked at her. Id.  She reported her auditory hallucinations had decreased and that she is able to focus better. Id.  Her mood was sullen. Id. Her thought processes were positive for mild hallucinations. Id.

Ms. Russano presented for her Perseris injection on August 19, 2022. R. at 953. She reported she was doing ok and hearing just muffled voices. R. at 954. She reported symptoms of ADHD: inattentive, distractable, no follow through, poor focus. Id.  She denied sadness or mania.

Id.  Upon examination, she was euthymic and cooperative with appropriate affect and speech. Id. She was continued on Perseris, Qelbree, and Klonopin. R. at 955.

Ms. Russano met with Mr. Parent on August 25, 2022. R. at 977. She reported that she had started school again and was taking the classes she failed the previous semester and a new class. Id.  She reported a good meeting with her nurse practitioner and that she was good on her latest medication regimen. Id. She said she was only hearing voices very lowly and was able to focus better. Id.  She had been feeling better but was always afraid she would become distracted, paranoid, and have more hallucinations. Id.  Her mood was anxious. Id.  Her thought processes were positive for auditory hallucinations. Id.

Mr. Parent completed a Medical Source Statement on October 29, 2022. R. at 979-82. He reported treating Ms. Russano for symptoms of schizophrenia since February 2020. Id.  He noted symptoms include paranoid delusions of persecution, erotic paranoid delusions, chronic auditory hallucinations, some visual hallucinations, thought disorganization, anxiety, excessive worry, and anhedonia. R. at 979. Her opined that she would have marked limitations in understanding, remembering, or applying information; adapting and managing herself; and activities of daily living. R. at 980. He opined that she would have extreme limitation in concentrating, persisting, or maintaining pace and interacting with others. Id.  He opined that Ms. Russano's response to medication is erratic and that she is not able to consistently perform activities within a schedule or maintain regular attendance. Id.  He opined that she could not consistently accept instructions and respond appropriately to criticism from supervisors because her paranoid delusions interfere with her perception of reality. Id.  He opined that she would have to miss work due five or more days due to her medical conditions because her paranoid delusions and auditory hallucinations interfere with her ability to remain consistent. Id. He opined that Ms. Russano would be off task more than

25% of an eight hour workday due to inability to pay attention or concentrate. Id.  He estimated she would need unscheduled breaktime of more than 45 minutes per workday due to intermittent thought disorganization. Id.  He stated that he does not believe Ms. Russano is exaggerating her medical conditions or is a malingerer. Id.

*State Agency Consultant Opinions*

In reviewing Ms. Russano's application for disability benefits, the state agency assigned Christal Janssen, Psy.D., to review and assess her medical records. Dr. Janssen concluded that Ms. Russano's activities of daily living suggest problems with anxiety, stress, social functioning, and psychotic symptoms, but that she is able to manage personal care and medication with reminders, make simple meals, count change, manage accounts, read, and socializes daily by text. R. at 101. Dr. Janssen also found that the evidence supports medically determinable impairments, but not a remarkable impairment in mood, interaction, or cognition. Id. She noted that mild to moderate limits are supported. Id. She found that Ms. Russano appears able to perform simple, repetitive, routine tasks with "incidental interpersonal contact and direct/concrete supervision." Id. In addressing Ms. Russano's residual functional capacity, Dr. Janssen opined that Ms. Russano is moderately limited in ability to understand and remember detailed instructions; moderately limited in ability to carry our detailed instructions and maintain attention and concentration for extended periods; moderately limited in ability to maintain an ordinary routine without special supervision; moderately limited in ability to accept instructions and respond appropriately to criticism from supervisors; and  moderately limited in ability to respond appropriately to changes in work setting. R. at 103-06.

On reconsideration of Ms. Russano's application, the stage agency assigned psychologist George A. Bolkenberg to review the medical records and the original findings and decision. Mr.

Bolkenberg concluded that the medical evidence since the initial evaluation suggested the same level of severity and impairment and affirmed the original examiner's conclusions. R. at 117. Mr. Bolkenberg opined that Ms. Russano was moderately limited in ability to understand and remember detailed instructions; however, she was able to learn semi-skilled tasks with routine on-the-job instruction, and could understand and recall three to four step instructions. R. at 118. He found further that Ms. Russano was moderately limited in ability to carry out detailed instructions, maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. R. at 119. However, he also found that Ms. Russano can learn semi-skilled tasks with routine on-the-job instruction and that once learned, she is able to carry them out over the course of a work day/week." Id. He found that Ms. Russano is moderately limited in ability to accept instructions and respond appropriately to criticism from supervisors, but that she can relate to others on a superficial work basis with limited public contact and that she can respond appropriately to typical instructions and typical redirection but may have some limitations in conflict situations. Id. He also opined that she can understand, remember and carry out semi-skilled (3-4 steps) tasks and can maintain the attention to carry out semi-skilled (3-4 steps) tasks with appropriate breaks (i.e. every 2 hours) over the course of a workday and a 40 hour work week. Id. In addition, he opined that Ms. Russano can perform activities within a schedule, maintain regular attendance, make simple work-related decisions, be aware of normal hazards, and travel to unfamiliar places. Id. Finally, he opined that she can adapt to routine and predictable changes in the work-place and would do best in an environment without changing demands or quotas. Id.

## Decision of the Administrative Law Judge

The ALJ determined that Ms. Russano has the severe impairments of schizophrenia, paranoia, and anxiety. But, the ALJ found that Ms. Russano does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

After considering the record, the ALJ found that Ms. Russano has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 416.967(c), except she could do one to two step simple work tasks. She should avoid working with the general public. She should work as little as possible with co-workers. She cannot work on an assembly line or a timed project. Of relevance to the present appeal, in making the RFC assessment, the ALJ considered the June 2022 medical source statement of Nurse Davis and found it to be unpersuasive because the findings contradicted her opinion that Ms. Russano was a malingerer and because the opinions were not in line with Davis' findings during repeated examinations showing Ms. Russano's results to be generally normal. The ALJ also considered the opinion of social worker Parent. She found it to be unpersuasive because he opined that she had an extreme limitation in interacting with others but this was inconsistent with his August 2020 visit with her when she reported she had been invited to and had attended a party.

The ALJ also considered the opinions of state agency psychological consultants Jansen and Bolkenberg and found them persuasive. Specifically, the ALJ found that their opinion that she would have mild limitation in her ability to understand, remember or apply information was supported by Nurse Davis' findings that her memory was intact but that she had trouble staying

focused, as well as Ms. Russano's report to Schlumbrecht in April 2022 that she was able to obtain 2 As and a B in her classes. The ALJ found the consultants' opinion that she would have moderate limitations in her ability to interact with others supported by her report in April 2021 that she was often suspicious of other people's motives and that she thought her friend wanted to kill her. The ALJ found the consultants' opinion that Ms. Russano would have moderate limitations with concentration, persistence, and pace was supported by her reports to Davis that she would get distracted easily and had trouble staying focused to get work done. And the ALJ found the consultants' opinion that Ms. Russano had mild limitations in her ability to adapt or manage herself was supported by the collective nature of her symptoms but also by the fact that she was able to attend college classes online and that she had been consistently on time to the degree she had earned 2 As and a B.

The ALJ found that although Ms. Russano had been diagnosed with mental impairments and has symptoms associated with her impairments, those symptoms have been greatly reduced with her adherence to her prescribed medication regimen and her therapeutic counselling sessions. The ALJ noted that Ms Russano had been able to take online classes and spend time going out to dinner with her family. He found that her auditory hallucinations had greatly diminished and appeared only at night. Based on all the evidence, the ALJ assigned the RFC described above.

The ALJ next found that Ms. Russano has no past relevant work. The ALJ found that Ms. Russano was classified as a younger individual aged 18-49 under the regulations and that she has at least a high school education. Next, the ALJ found that considering Ms. Russano's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Russano can perform. In making this determination, the ALJ considered

the testimony of the vocational expert. The ALJ concluded that Ms. Russano has not been under a

disability as defined by the Act since May 17, 2021, the date the application was filed.

## Statement of Issues on Appeal

Issue No. 1.    Is the ALJ's residual functional capacity analysis supported by substantial
                evidence?

Issue No. 2.    Did the ALJ err in finding jobs available in the economy that the claimant can
                perform because the dictionary of occupational title description for the jobs relied
                on by the ALJ exceed the claimant's residual functional capacity limiting her to
                only one or two step jobs?

## Analysis

### I.  Applicable Law

#### a.  Entitlement to Benefits under the Act

To be considered disabled under the Act, a claimant must establish that she is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant

bears the burden of proving that he is disabled within the meaning of the Act. Fraga v. Bowen, 810

F.2d 1296, 1301 (5th Cir. 1987).

Pursuant to the regulations promulgated under the Act, the Commissioner engages in a

five-step sequential evaluation process to determine whether an individual qualifies as disabled.

See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual

is or is not disabled (depending on the step), her decision is made on that basis and she does not

proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity
> (whether the claimant is working); (2) whether the claimant has a severe
> impairment; (3) whether the claimant's impairment meets or equals the severity of
> an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether

the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.

An assessment of the claimant's residual functional capacity or "RFC" is used in steps four and five to determine the claimant's ability to perform her past work or any other type of work. Id. The RFC is an assessment of the most a claimant can still do despite her limitations and is determined based on all the relevant evidence in the case record. Id.; see 20 C.F.R. § 945(a)(1). At the hearing level, the ALJ is solely responsible for assessing RFC. 20 C.F.R. § 416.946(c); see Taylor v. Astrue, 706 F.3d 600, 602–03 (5th Cir. 2012).

**b. *Standard of Review.***

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez, 415 F.3d at 461.  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

### c. *Medical Opinions*

The regulations require that the ALJ explain how the supportability and consistency factors were considered for a medical opinion or prior administrative medical findings. 20 C.F.R. § 416.920c. Yet the ALJ is not always required to do an exhaustive point-by-point discussion of every opinion reviewed. Silva v. Kijakazi, No. 22-51045, 2023 WL 3723628, at *1 (5th Cir. May 30, 2023). And "the ALJ's assessment and articulation of consistency and supportability must be read in full context of the RFC findings." Teixeira v. Comm'r, SSA, No. 421CV00003SDJCAN, 2022 WL 3130859, at *9 n. 15 (E.D. Tex. July 12, 2022), report and recommendation adopted, No. 4:21-CV-3, 2022 WL 3107856 (E.D. Tex. Aug. 4, 2022); see Cox v. Comm'r of Soc. Sec., No. 3:21-CV-53-JMV, 2022 WL 834294, at *3 (N.D. Miss. Mar. 21, 2022). "At a minimum, the ALJ's discussion must give enough reasons to permit meaningful judicial review." Hubbard v. Comm'r of Soc. Sec., No. 4:20-CV-00588-BP, 2022 WL 196297, at *4 (N.D. Tex. Jan. 21, 2022).

### d. *Conflicts between the DOT and the vocational expert's testimony*

While the DOT is relied on "for information about the requirements of work in the national economy," a vocational expert ("VE") "may be able to provide more specific information about jobs or occupations than the DOT." Policy Interpretation Ruling: Titles II & XVI: Use of

<u>Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions</u>, SSR 00-4P (Dec. 4, 2000). A vocational expert's testimony "generally should be consistent with the occupational information supplied by the DOT." <u>Id.</u> The burden is on the adjudicator to "elicit a reasonable explanation for the conflict" when there exists "an apparent unresolved conflict between VE . . . evidence and the DOT." <u>Id.</u> At the hearing, it is the adjudicator's duty to "fully develop the record" and inquire on the record "whether or not there is such consistency" in the vocational expert's testimony. <u>Id.</u> An affirmative responsibility rests on the adjudicator "to ask about any possible conflict between that VE or VS evidence and information provided in the DOT" when a vocational expert "provides evidence about the requirements of a job or occupation." <u>Id.</u> A vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." <u>Id.</u>

The ALJ's failure to resolve a direct and obvious conflict typically requires a remand. <u>Carey v. Apfel</u>, 230 F.3d 131, 143-47 (5th Cir. 2000); <u>Santamore v. Kijakazi</u>, No. 1:20CV169 HSO-LGI, 2022 U.S. Dist. LEXIS 236637, at *16 (S.D. Miss. Dec. 30, 2022). Importantly, though, "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." <u>Carey v. Apfel</u>, 230 F.3d 131, 146-47 (5th Cir. 2000). Thus where conflicts are merely alleged, indirect, or implied, a claimant may not challenge the conflict on appeal where she failed to object at the administrative level. <u>Bailey v. Saul</u>, 853 F. App'x 934, 937 (5th Cir. 2021) (citing <u>Carey</u>, 230 F.3d at 146-47).

For example, in <u>Carey v. Apfel</u>, the Fifth Circuit held that there was no conflict or that, at best, it was tangential where the vocational expert testified that the claimant could perform certain

work with one arm and the DOT description of the cited jobs required fingering and handling. 230 F.3d at 143-47 (5th Cir. 2000). The Fifth Circuit explained that the DOT did not require "*bilateral* fingering ability or dexterity and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm." Id. at 146 (emphasis added). The DOT was thus silent on whether the job could be performed with the use of only one arm. The ALJ relied on the testimony of the vocational expert to conclude that the claimant could perform the cited work, and the Fifth Circuit in Carey made clear that this was entirely proper under the circumstances. Id. at 146-47.

## II.    Plaintiff's Appeal.

### Issue No. 1.    Is the ALJ's residual functional capacity analysis supported by substantial evidence?[4]

Plaintiff argues that the ALJ failed to account for the "total limiting effects" of her severe impairments. She argues that the evidence establishes far greater limitations than the ALJ found and that she has met her burden of demonstrating that she is disabled under the Act. She cites the opinions of the state agency consulting psychiatrist, nurse practitioner Davis, and social worker Parent as well as her own testimony. She also alleges that the ALJ's analysis and conclusions are defective on several grounds. The Court agrees.

First, Ms. Russano argues that the ALJ did not reasonably conclude that she could sustain full-time work without accounting for off-task time and absenteeism related to her severe mental

---

[4] Ms. Russano describes her first assignment of error as the ALJ's purported failure to "account for the 'total limiting effects' of Plaintiff's severe impairments." Her theory appears to be that failure to accurately describe a claimant's impairments in the RFC is "contrary to law" and therefore any vocational expert testimony based thereon is defective and cannot amount to substantial evidence supporting a denial of benefits. Here, the Court considers each of the alleged defects in the RFC and the ALJ's analysis of the opinions and testimony to determine whether the ALJ applied the correct legal standard. However, the Court finds that the more accurate description of the standard the Court is required to apply to assessing the ALJ's conclusions is whether they are supported by substantial evidence. As discussed above, the Court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the appropriate legal standards. Perez, 415 F.3d at 461.

impairments as opined by nurse Davis and social worker Parent. Subsumed within this alleged error is Ms. Russano's argument that the ALJ improperly analyzed the opinions of Davis and Parent and unreasonably found the opinions non-persuasive.

The Court finds that the ALJ erred in analyzing the Davis opinion. The ALJ concluded that Davis' opinions regarding Ms. Russano's limitations in interacting with others; following basic instructions; concentration, persistence, or pace; and dealing with work stress contradict Davis' opinion that Ms. Russano is a malingerer and are not in line with "generally normal" findings by Davis during repeated examinations. Critically, though, the former explanation misreads the Davis opinion, which found Ms. Russano was **not** a malingerer—as the Commissioner himself appears to admit.[5] The Court finds that the ALJ's mistake may very well have influenced his assessment of the Davis opinion. It is not merely a harmless error.[6]

Although the ALJ also cited inconsistencies with the "generally normal" findings of the Davis treatment records, this is not enough to overcome the possible influence of the ALJ's mistaken understanding that Davis considered Ms. Russano a malingerer. While these records do reflect that Ms. Russano typically presented with a normal mood and no signs of depression, elevated mood, anxiety, or attentional difficulties, they also include abnormal findings. For example, in November 2021 she reported anxiety symptoms several times a day. R. at 889. In May 2022 she reported lots of voices, continued anxiety, and a subjective feeling of apprehension. R. at 935. She presented as guarded and tense. Id. Psychotic or borderline psychotic symptoms appeared to be present and bizarre behavior was observed. Id. Of the three treatment dates specifically cited by the ALJ, on November 18, 2020, Davis observed behavior consistent with

---

[5] See Rec. Doc. 12, at 12 n. 4 (acknowledging that Davis checked "no" for malingerer).
[6] Keel v. Saul, 986 F.3d 551, 556 (5th Cir. 2021) ("Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err.").

auditory hallucinations. Id.  On that date, Ms. Russano reported "command voices" telling her to hang herself, though she stated she would not hurt herself. Id. The February 7, 2022, treatment notes cited by the ALJ include Ms. Russano complaining she was having a hard time getting motivated to do her schoolwork. R. at 907. She reported that the Vistaril (hydroxyzine) prescription caused her to be a zombie and she could not get up and work. Id. She complained of getting distracted easily and being fidgety. Id. Davis noted that her symptoms of manic process were unimproved. Id. Ms. Russano presented as flat, distracted, and minimally communicative, although Davis also noted that her mood was normal with no signs of depression, mood elevation, psychotic process, anxiety, or attentional difficulties. R. at 908. Considering the variety of information in the treatment records (some of which could support Davis' conclusions), the Court cannot find that the ALJ would necessarily have found the Davis opinion non-persuasive had he realized Davis did not think Ms. Russano was a malingerer. As a result, the Court finds this error affects Ms. Russano's substantial rights. This matter should be remanded so that the ALJ can properly assess the Davis opinion.

As to social worker Parent, the ALJ found his opinion unpersuasive because he opined that Ms. Russano had an extreme limitation in interacting with others when he also received reports from her that she had been invited to a party with friends and had attended. There is no error in the ALJ's conclusion that Mr. Parent's opinion of extreme limitation is inconsistent with his treatment notes. However, Russano appears to rely on Mr. Parent's opinion that she would be off task more than 25% of the workday due to her inability to pay attention or concentrate. The ALJ does not explain whether he found this opinion inconsistent with the record and, if so, on what basis. Although the ALJ need not address every piece of evidence, he must provide enough explanation "to allow the court to undertake a meaningful review of whether his reasoning was supported by

29

substantial evidence." Pearson v. Comm'r of Soc. Sec., No. 1:20-CV-166-HSO-RPM, 2021 WL 3708047, at *5 (S.D. Miss. Aug. 11, 2021), report and recommendation adopted, No. 120CV00166HSORPM, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021); see Cooley v. Comm'r of Soc. Sec., 587 F. Supp. 3d 489, 500 (S.D. Miss. 2021); Watts v. Kijakazi, No. CV 21-2044, 2022 WL 18109797, at *7 (E.D. La. Nov. 18, 2022), report and recommendation adopted, No. CV 21-2044, 2023 WL 35799 (E.D. La. Jan. 3, 2023); see also Price v. Astrue, 401 F. App'x 985, 986 (5th Cir. 2010) ("The ALJ does not need to comment on every piece of evidence, but only must build an accurate and logical bridge between the evidence and the final determination.). The "Court cannot build a logic bridge based on pure speculation and *post hoc* rationalizations." Cooley, 587 F. Supp. 3d at 500. The Court cannot now scour the record and cite examples of possible inconsistencies in support of the ALJ's conclusion. On remand, the ALJ should also address Parent's opinion that Ms. Russano would be off task for more than 25% of the workday and explain whether or not it is persuasive and why.

Next, Ms. Russano argues that the ALJ failed to adequately explain why stress-related limitations were excluded from the RFC when the state agency consultants, Davis, and Parent all opined to her limited ability to interact socially and cope with workplace stressors. This argument appears to be based on Nurse Davis' opinion that Ms. Russano would be markedly limited in her ability to deal with normal work stress.[7] R. at 730. As discussed above, the ALJ erred in assessing the Davis opinion. On remand, the ALJ should also consider whether additional limitations to account for workplace stress[8] should be included in the RFC.

---

[7] Neither the state agency consultants nor social worker Parent opined to any "workplace stress" limitations. And the ALJ included limitations with regard to Ms. Russano's ability to interact with others in the RFC. This leaves only Nurse Davis' opinion on workplace stress.

[8] The Court notes that the RFC already limits Ms. Russano to work with one or two step tasks, work with minimal contact with the general public and co-workers, and not on an assembly line or timed project, which may account for some ordinary workplace stress.

Plaintiff argues further that the ALJ erred in failing to explain why limitations related to supervision were excluded from the RFC despite the state agency consultant's RFC opinion that plaintiff have "direct/concrete supervision" especially where the ALJ found the consultant's opinion persuasive.[9] R. at 101. R. at 104, 119. The Commissioner correctly points out that the ALJ is not required to adopt every part of an opinion and can permissibly find only some portions of an opinion persuasive. See Silva, 2023 WL 3723628, at *1; see also McManus v. Astrue, No. CIV.A. 1:08CV113-SAA, 2009 WL 5174683, at *6 (N.D. Miss. Dec. 21, 2009) ("Although the ALJ did give significant weight to [the treating physician's] opinion, he was not required to adopt all portions of it."). But, unlike in Silva,[10] the ALJ here did not explicitly find some portions of the state agency consultant's opinions to be non-persuasive. He simply did not include some of those opinions in the RFC. To the extent the ALJ found the supervision limitation opinion non-persuasive, the ALJ offered no explanation for that conclusion. As noted, the Court cannot fabricate a post hoc rationalization. The ALJ erred in failing to explain why the state agency opinions were persuasive yet the ALJ did not include any limitations related to supervision as opined by the state agency consultants. It is unclear whether this was an oversight or an intentional determination by the ALJ. This error has affected Ms. Russano's substantial rights. On remand, the ALJ must also consider whether the state agency consultants' opinions on the need for direct/concrete supervision are persuasive and, if so, whether additional limitations should be included in the RFC.

---

[9] As discussed above, the state agency consultant also found that Ms. Russano was moderately limited in her ability to sustain an ordinary routine without special supervision.

[10] It is unclear whether the ALJ did so in McManus.

**Issue No. 2.    Did the ALJ err in finding jobs available in the economy that the claimant can perform because the DOT description for the jobs relied on by the ALJ exceed the claimant's residual functional capacity limiting her to only one or two step jobs?**

Ms. Russano argues that the DOT description for the jobs relied on by the ALJ are inconsistent with the RFC limiting her to only one or two step jobs. However, the Court finds no support for this interpretation. The DOT lists at least 11 "duties" that a person with each job would perform. To the extent Ms. Russano urges this Court to interpret some or all of these numbered duties as steps in a job or task, it is simply not reasonable to do so. Each numbered item—and in many cases each list within a numbered item—is a duty in and of itself. For example, Kitchen Helper lists "washes worktables, walls, refrigerators, and meat blocks" after the number "2." But this does not reflect multiple steps in a job or task. Instead, number "2" itself lists four separate tasks that a person might perform as a Kitchen Helper. Similarly, Industrial cleaner lists "Cleans lint, dust, oil, and grease from machines, overhead pipes, and conveyors, using brushes, airhoses, or steam cleaner" after number "3." Although types of debris and tools are listed, the duty does not list multiple steps in a single job or task. It offers different examples of tasks a Kitchen Helper might perform.

Arguably, some of the listed duties are less clear. For example, the DOT provides that a Cook Helper "Washes, peels, cuts, and seeds vegetables and fruits" and "dips food items in crumbs, flour, and batter to bread them." Again, these lists appear to reflect possible duties that a Cook Helper might perform (i.e., washing fruit or peeling vegetables or cutting fruit or dipping food items in crumbs). Could these descriptions reflect jobs or tasks with more than two steps? To the extent this could be one reasonable interpretation, it is certainly not the only reasonable one. The vocational expert testified that the jobs of Kitchen Helper, Industrial Cleaner, and Cook Helper could be performed by a person limited to one or two step jobs. She testified that her testimony

was consistent with the DOT. The Court agrees. There is no obvious or direct conflict between the testimony of the vocational expert on this point and the DOT just because the DOT could be open multiple interpretations. See Carey, 230 F.3d. at 145-46. At best, Ms. Russano has identified the type of implied or tangential conflict that she should have raised at the hearing to preserve. See id. at 146-47. Under the circumstances here, the ALJ's obligation to resolve conflicts was not triggered. There is no reversible error.

### **RECOMMENDATION**

The undersigned finds that the ALJ erred in assessing the persuasiveness of the medical opinion of Nurse Davis, in failing to explain the reason for rejecting social worker Parent's opinion regarding Ms. Russano's off-task time, and in failing to include limitations related to supervision in the RFC as opined by the state agency opinions the ALJ found persuasive or failing to explain why he considered those opinions non-persuasive. Because the undersigned finds these errors affected Ms. Russano's substantial rights, IT IS RECOMMENDED that the decision of the Commissioner be reversed and this matter be remanded for further consideration of these opinions pursuant to sentence four of 42 U.S.C. § 405(g).

### **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8th day of May, 2024.


_____
Janis van Meerveld
United States Magistrate Judge